06-0978-cv
Havey v. Homebound Mortgage, Inc.

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term 2006

(Argued: April 11, 2007                                    Decided: October 22, 2008)

Docket No. 06-0978-cv

LINDA HAVEY,

     *Plaintiff-Appellant,*

     v.

HOMEBOUND MORTGAGE, INC., GARY W. TUORILA, JUDITH TUORILA,
KATHY MACSWEEN AND SHANE SEMPREBON,

     *Defendants-Appellees.*

Before: WINTER, LEVAL, and CABRANES, *Circuit Judges.*

Plaintiff appeals from a grant of summary judgment by the United States District Court for the District of Vermont (Jerome J. Niedermeier, *Magistrate Judge*) in favor of the defendants on her claims for violations of the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). We hold that (1) prospective adjustments to an employee's salary based on the quality of work which do not reduce the "predetermined amount" of salary do not violate the "salary-basis test" of the FLSA so long as the salary scheme was not designed to circumvent the requirements of the FLSA; and (2) prospective adjustments to an employee's salary based on projected quantity of work performed do not necessarily violate that test.

Affirmed.

          JOHN L. FRANCO, JR., Burlington, VT, *for Plaintiff-Appellant.*

          GARY L. FRANKLIN, Primmer Piper Eggleston & Cramer PC,
               (Christina A. Jensen, Lisman, Webster, Kirkpatrick &

Leeckerling, *on the brief*) Burlington, VT, *for Defendants-Appellees*.

PIERRE N. LEVAL and JOSÉ A. CABRANES, *Circuit Judges*:

Plaintiff-appellant Linda Havey ("Havey"), who was formerly employed as a mortgage underwriter by defendant-appellee Homebound Mortgage ("Homebound"), brought this action claiming that Homebound and its officers failed to pay her overtime compensation as required by the Fair Labor Standards Act ("FLSA" or "the Act"), 29 U.S.C. § 201 *et seq*. Defendants responded that Havey was employed in "a bona fide . . . administrative . . . capacity" and was therefore exempt from the overtime provisions of the FLSA. 29 U.S.C. § 213(a)(1). The United States District Court for the District of Vermont (Jerome J. Niedermeier, *Magistrate Judge*)[1] agreed with defendants and granted their motion for summary judgment. The sole issue raised on appeal is whether, as a matter of law, the system of compensation applicable to Havey met the test to qualify her as one employed in a "bona fide administrative capacity." We affirm the grant of summary judgment, concluding that plaintiff was employed in a "bona fide administrate capacity" and accordingly excluded from the overtime compensation requirements of the FLSA.

## BACKGROUND

Havey was formerly employed by Homebound, a mortgage brokerage and loan underwriting company incorporated and doing business in Vermont,[2] where she worked as a mortgage underwriter from April 2002 until she was terminated in November 2003. During her tenure, underwriters at Homebound received a base salary of $48,000 and were also eligible for additional "tiered compensation," which allowed them to receive more pay by agreeing to process more loans in a given

---

[1] Upon consent of the parties, a magistrate judge "may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case." 28 U.S.C. § 636(c)(1).

[2] Homebound ceased operations in July 2004, shortly after Havey filed this action. *See Havey v. Homebound Mortgage, Inc.*, No. 2:03-cv-313, 2005 WL 1719061, at *1 (D. Vt. July 21, 2005).

quarter, subject to reduction of this additional amount depending on the quality of the work performed. Havey was not paid overtime for working more than 40 hours per week. Havey brought this action claiming that she was entitled to overtime compensation under the FLSA and the parallel state statute, the Vermont Fair Employment Practice Act, 21 V.S.A. § 383,[3] and that defendants, Homebound and its officers, failed to pay her.

FLSA and Implementing Regulations

The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," 29 U.S.C. § 202(a), and to "guarantee[ ] compensation for all work or employment engaged in by employees covered by the Act." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602 (1944). To that end, the Act imposes a number of wage and hour requirements, including the overtime provision at issue here. Pursuant to the FLSA, an employee must be compensated at a rate of "not less than one and one-half times the regular rate at which he is employed" for any hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). The overtime compensation requirement, however, does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1).

Rather than define the exemptions in the statute, Congress granted the Secretary of Labor broad authority to "define[ ] and delimit[ ]" these terms "from time to time by regulations." 29 U.S.C. 213(a)(1). *See also Auer v. Robbins*, 519 U.S. 452, 456 (1997) (describing the "broad authority" of the Secretary under the Act). Regulations issued pursuant to this authority define what it means to be

---

[3] Another former employee, JoAnne Anderson, was initially a co-plaintiff in this action, but has abandoned her claims and is not participating in this appeal.

The parties agree Vermont Fair Employment Practice Act is identical to the FLSA in all respects relevant to the instant dispute—that is, if Havey is exempt under the FLSA, she will be exempt under the Vermont statute. We express no view whether the standards of the Vermont statute are in fact identical to those of the federal statute. Because the parties agree that our determination based on the federal statute will govern the case under Vermont law, we, like the Magistrate Judge, will not address the state law question. *See Havey*, 2005 WL 1719061, at *2 n.1.

"employed in a bona fide . . . administrative . . . capacity" with reference to two tests for employees like Havey. 29 C.F.R. § 541.2 (2002).[4] The first, known as the "duties test," considers an employee's workplace responsibilities. Under the short version of this test,[5] "an employee who is compensated on a salary . . . basis at a rate of not less than $250 per week" and "[w]hose primary duty consists of . . . [t]he performance of office . . . work directly related to management policies or general business operations of his employer [and] requiring the exercise of discretion and independent judgment [is] deemed to meet all the requirements" of this test. *Id.* § 541.2(a)-(e)(2). The second, known as the "salary-basis test," considers an employee to be a bona fide administrative employee only if he is "compensated on a salary or fee basis," as opposed to compensation on an hourly basis. *Id.* § 541.2(e)(2). According to the regulations:

> An employee will be considered to be paid "on a salary basis" . . . if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a *predetermined amount* constituting all or part of his compensation, which amount is not subject to reduction *because of variations in the quality or quantity of the work performed.*

*Id.* § 541.118(a) (emphasis added); *see also Auer*, 519 U.S. at 457 (observing that the "salary-basis test" has existed largely in the same form since 1954). With certain exceptions, "the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked." 29 C.F.R. § 541.118(a). In a sub-section entitled "minimum guarantee plus extras," the regulations allow that a "salary may consist of a predetermined amount constituting all or part of the employee's compensation. In other words, additional compensation besides the salary is not inconsistent with the salary basis of payment." *Id.* § 541.118(b). For example, "a branch

---

[4] The parties agree that later amendments to the regulations, effective 2004, do not apply in this case. All citations herein are to the 2002 regulations relied upon by the parties and the District Court.

[5] Under the regulations that were effective during the relevant period, there were two tests for determining whether a position qualifies for the administrative exemption: a short test and a long test. *Compare* 29 C.F.R. § 541.2(e)(2) (2002) ("Provided, [t]hat an employee who is compensated on a salary . . . basis at a rate of not less than $250 per week [and satisfies certain duties] . . . shall be deemed to meet all the requirements of this section.") *with* 29 C.F.R. 541.2(a)-(e)(2); *see also Donavan v. Burger King Corp.*, 675 F.2d 516, 518 (2d Cir. 1982) (explaining the short and long tests).

4

manager" who receives a salary plus a percentage of the branch sales or profits meets the salary test. *Id.* Discretionary bonuses do not affect the exempt status if they do not alter an employee's pre-determined compensation. *See* 29 U.S.C. § 207(e)(3); 29 C.F.R. § 778.211. However, "[t]he test of payment on a salary basis will not be met . . . if the salary is divided into two parts for the purpose of circumventing the requirement of payment 'on a salary basis'." *Id.* § 541.118(b).

Homebound's Compensation System

Unless otherwise stated, the following facts are not disputed by the parties. Under Homebound's compensation system in effect at all times relevant to this dispute, the "base level" salary of an underwriter like Havey corresponded to the number of loans he or she reviewed each month in the previous quarter. There were four possible "base levels." The lowest "base level" salary was $48,000; an underwriter was guaranteed this amount regardless of the quantity of loans reviewed per month or the quality of work. An underwriter's "base level" could increase for the following quarter if the underwriter reviewed 73 or more loans each month for a quarter. The highest "base level" was $64,000 for underwriters who had reviewed 105 or more loans each month in the previous quarter and were expecting to continue at this rate.

An underwriter's salary was reviewed on a quarterly basis by Homebound management and adjusted to a new "base level" salary applicable to the following quarter as agreed by Homebound and the underwriter. After the quarterly review, the underwriter was required to sign a statement agreeing "to maintain the . . . goal level [in terms of numbers of loans reviewed] that coincide[d]" with the assigned salary. Underwriters were eligible for additional bonuses for exceeding their productivity targets in addition to the salary adjustments, which were paid every four to five weeks. If the underwriter did not meet the current goal level for a period of two months in one quarter, his or her salary would "be reduced to the applicable level [he or she] is currently underwriting too [sic]." Depending on the number of defects found in an underwriter's work, the underwriter's base level could "be reduced to [the] next level down until [the] defects are under control." The parties

5

dispute whether these adjustments occurred only at the beginning of the quarter when a base level was agreed upon or whether they also occurred mid-quarter. It is undisputed that in no circumstance would the salary of an underwriter fall below the predetermined amount of $48,000.

Procedural History

Havey brought this action in the District Court, claiming that defendants, Homebound and its officers, failed to pay her overtime compensation as required by the FLSA and the Vermont Fair Employment Practice Act, 21 V.S.A. § 384(b). In response, defendants contended that Havey was employed in "a bona fide administrative capacity" and was therefore exempt from the overtime provisions of the FLSA under 29 U.S.C. § 213(a)(1).

In granting summary judgment to defendants, the Magistrate Judge agreed that Havey was an administrative employee and was therefore exempt from the overtime provisions of the FLSA. *See Havey v. Homebound Mortgage, Inc.*, No. 2:03-cv-313, 2005 WL 1719061 (D. Vt. July 21, 2005). The Magistrate Judge evaluated Havey's position under both the "salary-basis test" and the "duties test." He concluded that the system of compensation applicable to Havey during the relevant time period did not run afoul of the "salary-basis test" because (1) all underwriters were guaranteed a salary rate of $48,000 regardless of their efficiency and (2) any involuntary adjustments based on the number of loans processed applied only prospectively. *Id.* at *4-5. With respect to reductions due to quality (*i.e.*, loan defects), the Magistrate Judge found there was no evidence that any quality control reductions were ever made; there was no system in place for tracking deductions; and even if such a system existed, these reductions were also prospective in nature and could never bring an underwriter's salary below $48,000 per year. *Id.* at *5. The Magistrate Judge ruled that the underwriters also satisfied the "duties test" because their primary duties were nonmanual tasks related to Homebound's business and involved the exercise of discretion or independent judgment. *Id.* at *5-7.

This appeal followed. Before our Court, Havey argues that Homebound's compensation

system for underwriters fails to qualify her as "employed in a bona fide . . . administrative . . . capacity" for two reasons. 29 U.S.C. § 213(a)(1). First, Havey contends that the compensation system permits deductions within a pay period. She points to statements on the job description sheet issued by Homebound that if more than five in 100 loans made by the underwriter contain defects, the underwriter's base level "will be reduced to [the] next level down until [the] defects are under control" and indicated that her manager informed her that such reductions would occur immediately. She further contends that Homebound's compensation policy permitted downward penalty adjustments within the pay period for underperforming underwriters not keeping pace with their expected loan volume. Second, Havey argues that the trial court misapplied the "minimum guarantee plus extras" provision of 29 C.F.R. § 541.118(b). She contends that Homebound's two-part salary scheme is of the type not permitted by the regulation.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *See, e.g.*, *Singh v. City of New York*, 524 F.3d 361, 366 (2d Cir. 2008). In doing so, we view the facts in the light most favorable to the non-moving party, which in this case is Havey, and resolve all factual ambiguities in her favor. *See id.* To avoid summary judgment on a factual issue, however, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The sole issue raised on appeal is whether, as a matter of law, the system of compensation applicable to Havey from December 1, 2002 until her termination in November 2003[6] qualified her as being employed in a "bona fide administrative capacity." We conclude that the tiered compensation system at issue satisfies the pertinent tests and plaintiff was not entitled to overtime

---

[6] Havey initially sought compensation for work performed before December 1, 2002 but has limited her appeal to the period of employment after that date.

7

compensation.

"[B]ecause the FLSA is a remedial act, its exemptions . . . are to be narrowly construed," and the burden rests on the employer to prove that a particular employee is exempt from the Act's requirements. *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991). Accordingly, Homebound must establish that underwriters were paid on a salary basis. We have stated that "[g]enerally, an employer that maintains the discretion to reduce an employee's compensation as a result of the employee's hours or the quality of the employee's work[ ] may not consider the employee to be paid on a salary basis." *Id.* at 615. However, "exempt status will be denied only if there is either . . . an actual practice of making . . . deductions," *Ahern v. County of Nassau*, 118 F.3d 118, 121 (2d Cir. 1997) (alteration in original) (internal quotation marks omitted), or, failing that, a "clear and particularized policy—one which effectively communicates that deductions will be made in specified circumstances." *Auer*, 519 U.S. at 461 (internal quotation marks omitted).

Given the broad scope of the FLSA and its implementing regulations, which reach all employees involved in interstate commerce, *see* 29 U.S.C. §§ 202(a)-(b), 207(a)(1), the regulations provide only general guidance to accommodate the varying needs of employers and employees in a diverse and varied national economy. *Cf. Acs v. Detroit Edison Co.*, 444 F.3d 763, 770 (6th Cir. 2006) ("[Plaintiffs have not] shown that the Fair Labor Standards Act generally circumscribes an employer's authority to choose the mechanics of a compensation system that suits its business needs."). The regulations specify that a salaried employee must be paid a fixed and predetermined amount, *see* 29 C.F.R. § 541.118(b) ("minimum guarantee plus extras" regulation), but do not prescribe when or how frequently this fixed element of compensation may be determined. Indeed, the agency's use of the word "predetermined" to describe the salary requirement indicates only that this element of an employee's compensation must be both fixed and determined prior to the period in which it would apply. The regulations also prohibit "deductions . . . made for time when work is not available" "if the employee is ready, willing, and able to work." *Id.* § 541.118(a)(1). Finally, the

regulations proscribe compensation systems designed to "circumvent[ ]" the "salary-basis test." *Id.* §
541.118(b).

A.      Pay adjustments within a pay period

Havey disputes Homebound's assertion that pay levels were adjusted only at the end of each
quarter on a prospective basis.  According to Havey, Homebound reduced pay in the middle of the
quarter for underwriters whose work had an excessive number of errors or who failed to meet their
productivity targets.  As we stated above, once the fixed minimum portion of an employee's
compensation has been determined, any reduction below that set amount would, in most
circumstances, violate the "salary-basis test."  *See* 29 C.F.R. § 541.118(a), *see* page 4 *ante* (text of
provision); *see also Martin*, 949 F.2d at 615 ("[I]t is clear that, under the strict definition contained in §
541.118(a) these employees [whose pay was docked for part-day absences] may not be considered
salaried.").  Because Homeland determined salary levels on a quarterly basis, an actual practice or a
clear and particularized policy that permitted intra-quarterly reductions below the predetermined
amount on the basis of quantity or quality of work performed would render plaintiff a non-salaried
employee.

Havey has failed to present any evidence of actual intra-quarterly deductions.  Before the
Magistrate Judge, she presented evidence of pay adjustments for three unnamed underwriters in
January 2004 and for her former co-plaintiff in July 2003.  However, each of these reductions was a
prospective quarterly pay adjustment.[7]

Lacking examples of actual mid-quarter reductions, Havey was required to show that

---

[7] To support her contention, Havey submitted certain of Homebound's payroll and financial records, but the
records concerning two of the unnamed employees indicate that the reductions occurred at the first pay period after the
end of quarter, consistent with the conclusion that these reductions were prospective.  The records also show that the
third employee experienced a similar reduction reflected in the first pay period after the end of the quarter.  The same
employee then saw an intra-quarter increase associated with a bonus received after the start of the quarter.  Havey's
former co-plaintiff testified that the July 2003 salary reduction was based on her desire to have a reduced schedule in the
summer months.  The reduction occurred as part of an agreement at the end of a quarter concerning her prospective
salary for the next quarter.  Accordingly, there is no evidence of an intra-quarterly pay reduction.

Homebound had a "clear and particularized policy" of such reductions. *Auer*, 519 U.S. at 461. Havey has argued that such a policy exists with respect to reductions in pay due to quality errors. The job description sheet indicated that an underwriters' pay could be reduced "to the next level down" if there was evidence of quality defects exceeding five per 100 folders, but did not discuss when this reduction will occur. Havey contends that this reduction could occur mid-quarter, while Homebound argues that this is impossible because a mechanism was never developed to implement this policy. The Magistrate Judge did not decide this disputed fact, because as he rightly noted, "Even assuming the policy was in place, however, any reductions were prospective, and were to efficiency pay only, never to the base salary of $48,000 per year." *Havey*, 2005 WL 1719061, at *5. No matter how many quality errors were committed, Havey has failed to show that under Homebound's policy, her pay could be reduced below her predetermined guaranteed salary of $48,000. Given the nature of her duties, the fact that her overall compensation for that quarter could be decreased due to quality errors does not render Havey a non-salaried employee if, under the employer's policy, the adjustments do not affect a "predetermined amount" portion of salary exceeding the regulatory threshold rate and only impacts the size of the increase above this amount. *See* 29 C.F.R. § 541.118(a) (noting that any employee who "regularly receives each pay period . . . a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed" is considered an employee paid "on a salary basis").

B.      Homebound's two-part salary scheme involving a "minimum guarantee plus extras"

Havey next claims that Homebound's salary scheme, which adjusts salaries each quarter on a prospective basis, is akin to the example of a non-salary system provided in 29 C.F.R. § 541.118(b). That is, she argues that although an underwriter is guaranteed a minimum compensation of $48,000 per year, any quarterly downward adjustment of a "base level" salary above $48,000 per year based on the quantity or quality of loans is still a "reduction because of variations in the quality or quantity

10

of the work performed" prohibited by 29 C.F.R. § 541.118(a). In support of her claim, Havey cites to the example of a non-salary scheme given in 29 C.F.R. § 541.118(b) which states:

> "The test of payment on a salary basis will not be met . . . if the salary is divided into two parts for the purpose of circumventing the requirement of payment 'on a salary basis.' For example, a salary of $200 in each week in which any work is performed, and an additional $50 which is made subject to deductions which are not permitted [under 29 C.F.R. § 541.118(a)]."

A two-part salary scheme in which employees receive a "predetermined amount," plus, on a quarterly prospective basis, an additional portion subject to deductions for quality errors does not violate the "salary-basis test" unless the system is designed to circumvent the requirements of the FLSA. *See* 29 C.F.R. § 541.118(b). There is an important difference between the example of a non-salary scheme provided in 29 C.F.R. § 541.118(b) and Homebound's salary scheme. Pursuant to 29 C.F.R. § 541.2(e)(2), an individual who earns more than $250 per week and is engaged primarily in work directly related to management policies or general business operations "requiring the exercise of discretion and independent judgment" qualifies as one who is employed in a "bona fide administrative capacity" and this is not subject to the overtime provisions of the FLSA. In the example given by the regulation quoted above of a non-qualifying divided salary, the predetermined amount of salary guaranteed to an employee is only $200 and therefore fails to conform to the specification of a "rate of not less than $250 per week." The example given illustrates an effort to "circumvent[] the requirement[s]" by allowing deduction from a salary of $250 per week, which would drop the salary below the minimum threshold for the test. By contrast, Homebound's two-part salary scheme guarantees the underwriter a predetermined amount well in excess of the regulatory threshold. The defendant's two-part salary scheme was not designed for the purpose of circumventing the requirements of the FLSA. Rather, it was designed to give underwriters an incentive to take on larger quantities of work, while maintaining standards of care so that they were not receiving additional pay for shoddy work that needed to be done over.

Havey further argues that once an employer and employee enter into an employment

11

agreement that sets a "base level" salary, there can be no reduction below that base level. Such a rigid rule finds no support in the text of the FLSA or its regulations.[8]  Havey's argument might have validity if the salary scheme failed to provide an inviolable and sufficient minimum predetermined amount.  Homebound, however, guaranteed to Havey a predetermined minimum of $48,000, which taken together with her administrative duties, satisfies the tests.

The ability of an employer, acting unilaterally or as part of a voluntary agreement with its employee, to modify an employment agreement is not without limits.  Where the practice of prospectively changing salaries occurs so as to render the salary a "sham—the functional equivalent of hourly wages," *id.* at 1179, it would offend the "salary-basis test."  *See* 29 C.F.R. § 541.118(b). Homebound's quarterly prospective adjustment of a "base level," always matching or exceeding a predetermined amount of $48,000, could not be considered a sham.[9]

Under its tiered compensation system, Homebound and an individual underwriter prospectively set a "base level" salary each quarter, always matching or exceeding a predetermined $48,000, and potentially reaching a higher level based on the underwriter's agreement to process an elevated volume of loans during a given quarter while maintaining a certain quality level.  An underwriter would receive the predetermined portion of her pay (equivalent to $48,000 per year) for

---

[8] In a similar context, the Tenth Circuit found that quarterly, prospective adjustments based on the reduction in workload associated with the business needs of the employer did not violate the "salary-basis test."  The Tenth Circuit reasoned that:

> Although [29 C.F.R.] § 541.118 does not define "predetermined amount," the natural reading of the term is that it refers to the amount previously agreed on for the period for which the salary is to be paid, not an amount that had been agreed on for some earlier period.  Nothing in the language of the regulation suggests a contrary reading.  Section 541.118 prohibits various deductions from the contractual salary, but it contains no explicit requirement that the salary set ("determined") for one pay period be continued to the next.

*In re Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1184 (10th Cir. 2005).

[9] While we do not have the benefit of the views of the Department of Labor in this particular case, our holding is consistent with the position of the Department in certain of its opinion letters submitted in similar cases. *See Wal-Mart Stores, Inc.*, 395 F.3d at 1185-86 (collecting and analyzing DOL opinion letters).  In one of these letters, the Department explained that it has "consistently taken the position that a bona fide reduction in an employee's salary does not preclude salary-basis payment as long as the reduction is not designed to circumvent the requirement that the employees be paid their full salary in any week in which they perform work."  U.S. Department of Labor, Wage & Hour Div., Opinion Letter dated February 23, 1998, 1998 WL 852696.

the following quarter whether or not she met the productivity or quality targets. Any changes to the "base level" for the subsequent quarter would then be agreed upon by the employer and the underwriter. (Indeed, there is evidence that some of these changes were prompted by the underwriters themselves when they wanted to work less.) The "base level," and the employee's pay, however was never below the predetermined $48,000 rate. Accordingly, we conclude, given an underwriter's duties, that Homebound's practice of quarterly, prospective adjustments to an underwriter's "base level," based in part on the projected amount of work undertaken for the quarter but never falling below $48,000, does not give the underwriter an entitlement to overtime pay.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is **AFFIRMED**.

13